UNITED STATES *v.* GOLDING BROS. CO., INC.

**No. 5282.**—Invoices dated Sweveghem, Belgium, May 9 and January 2, 1938.
Certified May 12 and January 6, 1938.
Entered at New York May 25 and January 17, 1938.
Entry Nos. 115337 and 804387.

Third Division, Appellate Term

(Decided May 26, 1941)

*Charles D. Lawrence*, Acting Assistant Attorney General (*Samuel D. Spector*, special attorney), for the appellant.

*Siegel & Mandell* (*Samuel T. Siegel* of counsel) for the appellee.

Before CLINE and KEEFE, Judges

CLINE, Judge: This is an application for review of the decision of the trial court in *Golding Bros. Co., Inc.* v. *United States*, Reap. Dec. 5013. The issue before the court relates to the value of damask mattress tickings imported from Belgium. The invoice covered by No. 131837–A was certified by the United States consul on January 6, 1938, and that covered by No. 131836–A was certified on May 12, 1938.. The two cases were consolidated for hearing.

The merchandise was appraised at the United States value and the trial court found that it should be appraised at the export value at which the merchandise was invoiced.

The record contains two affidavits submitted by the importer, exhibits 1 and 2, and two customs agents' reports submitted by the Government, exhibits 3 and 4.

Exhibit 1 is an affidavit of Mr. Camille Verwée who is the manager of the manufacturing concern, Tissage La Flandre Société Anonyme. The affiant states that he has personal charge of the technical and commercial departments of the firm and has personal knowledge of all the transactions entered into with the firm; that the manufacturer is engaged in the business of manufacturing various textiles for sale in the home markets of Belgium and for export to other countries; that the damask mattress tickings such as were sold to Golding Bros. Co., Inc., and goods similar thereto are manufactured in large quantities in and near the village of Courtrai, Belgium; that the usual wholesale quantity in which such merchandise is dealt is one piece, 50 meters in length, in widths of 56 and 41 inches; that "these goods are freely offered for sale, some of the mills keeping a reasonable quantity in stock and some having all the facilities for prompt delivery"; that "the manufacturer is prepared to offer merchandise to customers, who either come to Europe or are contacted by the manufacturer's representative in the United States"; that all of this damask mattress ticking is merchandise of a similar character, the principal variation being in the pattern, although very frequently the same patterns are sold to different buyers in the United States; that "all of these goods are identical in method of manufacture and are commercially interchangeable"; that "the patterns are all commercially interchangeable, and frequently one quality is sold to several customers in the United States in a different pattern"; that the prices appearing on the invoice to Golding Bros. Co., Inc., dated May 9, 1938, certified

on May 12, 1938 (covered by reappraisement 131836–A) described as quality Richmond D.87, General Thomas D.108, Velmar D.88 and Richmond (Mollison) D.113, represent "the true market value of this particular described quality in Belgium at the time of exportation, unless otherwise noted in our invoices or in copies of actual sales or offers of identical merchandise, and that we were and are prepared and willing to sell in the usual wholesale quantities and in the ordinary course of trade this identical described quality at the prices at which they were sold and invoiced to Golding Bros. Co., Inc., of New York."

The affiant stated further that there is no understanding, or agreement, written or otherwise, which exists between his firm and Golding Bros. Co., Inc., of New York, whereby "we are to limit, restrict or confine our sales to said firm, as our sales to Golding Bros. Co., Inc., of New York are freely made with no restrictions whatsoever"; that "we offer the merchandise in question in the United States, South America, Australia, Belgium and France." The affiant states further

I further swear that while the invoice in question shows the correct purchase price of the merchandise *when purchased*, which purchase was contracted for some time before the merchandise was shipped to the United States, the invoice also declares the correct foreign market value in Belgium at the time the merchandise was exported to the United States, or the price at the time of exportation of the merchandise here in question which I would be willing to sell or offer the identical or similar merchandise.

    \*      \*      \*      \*      \*      \*      \*

With reference to qualities Richmond D. 87 Jacquard 41″, General Thomas D. 108 Jacquard 41″, Velmar D. 88 Jacquard 41″, these *particular widths* are made exclusively for export to the United States and are not widths which can be used or sold for use in the markets in Belgium nor to countries other than the United States, and the prices at which these merchandises were sold to Golding Bros. Co. Inc. are the prices at which our firm would have been willing to receive from anyone in the United States, desiring to purchase the same qualities in the same widths, and that the prices for export to the United States at the time of shipment here in question were francs: 3.80 *per yard of 41″ width* for Richmond D. 87; Francs 8.65 for General Thomas D. 108; and Francs: 6.27 for Velmar *per yard of 41″ width.* [Italics quoted.]

An examination of the invoice covered by No. 131836–A shows that under the unit invoice value for each quality there appear the words "actual value" followed by a price which in each case is less than the invoice price. The price stated as "actual value" on the invoice is the same for the 41-inch width in each case as that stated in the last paragraph above quoted. There are also many items in 56 inch widths of the same qualities as the 41-inch width goods. The trial court found that the invoice values were the dutiable values of the merchandise. As the importer did not file a cross-appeal, this division cannot find a lower value than that found by the trial court and therefore cannot consider the lower values which the

affiant stated were the export values at the time of shipment. *Johnson* v. *United States*, 13 Ct. Cust. Appls. 373, T. D. 41318.

The affiant refers in his affidavit to certain offers attached thereto and states that they remain standing or in effect until revoked or until different offers are made.

Exhibit 2 is another affidavit of Mr. Camille Verwée. It contains practically the same statements as are found in exhibit 1 except that it refers particularly to the shipment on the invoice dated January 2, 1938, certified on January 6, 1938, (covered by No. 131837–A). The affiant also refers in the affidavit to the offers attached thereto.

Exhibit 3 offered by the Government is a report of Treasury Representative Charles Schlager (No. 301/390) dated September 6, 1938. The customs agent reports that he visited the manufacturing firm on July 22, 1938, and had an interview with Mr. Verwée, the manager, who admitted that the ticking offered and sold in the home market is defective merchandise which would not be acceptable for shipment to the United States; that those job lots are liquidated in the Belgian market and are purchased by the poorer classes for use as table covers. He states further as follows:

Offers, however, have been made in other markets of this mattress ticking, but not a single sale has been made. Copies of these offers were submitted by the manufacturer with an affidavit dated February 11, 1938, which was transmitted with the Bureau's letter.

Photostatic copies of the offers referred to are attached to exhibit 3. The customs agent refers also to a former report, No. 301/1; dated April 6, 1938, wherein he stated that these particular qualities or even similar qualities had not been sold by this firm to customers in other foreign countries. He states that "this information is also confirmed by the present investigation" and that

The sales records of this firm show no sales of any of the quality numbers, as shipped to the United States, to any customers in any foreign countries. Furthermore, Mr. Verwée admits that customers in other markets, do not favor the American quality of ticking and that the quality purchased in the markets is quite different from that shipped to the United States.

Exhibit 4 is the report No. 301/1, dated April 6, 1938, which is referred to in exhibit 3. It relates to an investigation with respect to shipments of damask mattress tickings by Tissage La Flandre to Blumenthal Print Works of New Orleans, La. The consular invoices under investigation therein were dated from October 13, 1936, to September 7, 1937, and the qualities mentioned in that report do not appear to have the same names or numbers as the qualities herein involved and dates of the transactions appear to be too remote to be of interest in this case. It is noted, however, that the customs agent reports that certain of the qualities sold to the Blumenthal Print Works were sold also to Golding Bros. and Titus Blatter of New York.

This exhibit appears to be the same report as was introduced in evidence as exhibit 7 in *William J. Oberle, Inc. (Blumenthal Print Works) v. United States*, Reap. Dec. 4582. In that case the court held that all of the qualities covered by the sixty-eight appeals therein involved should be appraised at the export value, except one which was copyrighted by Blumenthal Print Works.

In the assignment of errors filed by the appellant it is claimed in No. 6 that the trial court erred in admitting exhibits 1 and 2 over objection and giving weight thereto. Appellant argues before this division that the copies of offers attached to exhibit 1 are in a foreign language and should have been rejected by the court. An examination of the record shows that this objection was not raised in the court below. The defendant below objected to the exhibits merely "on the general ground of immateriality, incompetency, and irrelevancy, with specific objections to be made in our brief." We have examined defendant's brief filed below and find that no specific objections were made therein with respect to these exhibits. Some of the offers in exhibit 2 (those addressed to firms in England and in Australia) are written in the English language. While the offers attached to exhibit 1 and some of those attached to exhibit 2 are written in a foreign language, with no English translations thereof, we are of opinion that the objection to the offers in a foreign language is not sufficient to warrant a rejection of the affidavits. They are written in English. There are certain slips in English attached to all of these offers but, inasmuch as they are not referred to in the affidavits and were not specially moved in evidence, we are of opinion that they have no evidential value.

An examination of the photostatic copies of offers attached to exhibit 3, which is the customs agent's report, shows that they contain the same offers as are attached to exhibit 2. Even if the offers in a foreign language are ignored, there still remains competent evidence in the exhibits which must be considered. We are of opinion that there is no merit in appellant's assignment of error number 6.

Counsel for the appellant argues in his brief that the trial court should have dismissed the appeals because the importer failed to show that the merchandise herein involved was freely offered for sale to all purchasers in the principal markets of Belgium at the time of exportation of the shipments in question. We cannot agree with appellant's assertion that the record does not show that such or similar goods were freely offered for sale in Belgium. The affiant stated in both exhibits 1 and 2, at pages 2 and 5, as follows:

\* \* \* What is known as a piece of damask ticking is a quantity of fifty meters or more in length and the usual width, which is 56 and 41 inches. *These goods are freely offered for sale,* some of the mills keeping a reasonable quantity in stock and some having all the facilities for prompt delivery. [Italics ours.]

\* \* \* \* \* \* \*

I further swear that we offer the merchandise in question in the United States, South America, Australia, Belgium and France.

To substantiate his statements the affiant attached copies of offers of the 56-inch goods made shortly prior to the shipments in each case to firms in Belgium, Germany, France, England, and Australia. Offers freely made establish value even though no sales resulted from the offers. In *Semon Bache & Co.* v. *United States*, 28 C. C. P. A. 166, C. A. D. 140, the court said:

In order to establish foreign value of merchandise, under the law as it existed at the time of the importation of the merchandise here involved, all unrestricted offers for sale in the principal markets of the country of manufacture, whether for home consumption or for export to countries other than the United States, should be considered. *United States* v. *Livingston & Southard, Inc.*, 23 C. C. P. A. (Customs) 214, T. D. 48060.

The merchandise in this case was exported prior to the enactment of the Customs Administrative Act of 1938 so that the provision in that act limiting foreign value to prices at which merchandise is sold for home consumption is not applicable in this case.

The affiant stated also that all of the damask tickings manufactured by the various mills in Courtrai were similar and the qualities were commercially interchangeable. In explaining what he meant by the use of the word "similar," he said:

When I refer to merchandise being similar I mean that the merchandise is of the same texture, structure and price and that the only differences of texture and structure are of a small degree (certainly less than 10%), and then even this difference cannot be determined without expert analysis. All of these goods are identical in method of manufacture and are commercially interchangeable. The principal difference is that of pattern and color. The same dyestuffs are used by all of us with this damask ticking, but different purchasers sometimes desire different patterns. The patterns are all commercially interchangeable, and frequently one quality is sold to several customers in the United States in a different pattern.

In *United States* v. *Irving Massin & Bros.*, 16 C. C. P. A. 19, 25, T. D. 42714, the court defined the word "similar," as used in the appraisement section, as follows:

In view of the common meaning of the word "similar" and of the authorities cited, we are of opinion, and so hold, that if goods are made of approximately the same materials, are commercially interchangeable, are adapted to substantially the same uses, and are so used, ordinarily, they are similar, within the meaning of section 402 (b).

In view of the evidence and the pronouncements of the appellate court above quoted, we are of opinion that the 56-inch goods covered by the shipments herein had foreign values at the time of exportation, but it appears from a comparison of the offers attached to the exhibits with the export values found by the trial court that the foreign values were not higher than the export values.

The appellant claims also that there are no export values for the goods because the evidence adduced by the importers does not controvert the statement of the customs agent in exhibit 4 that "each design is exclusively reserved to one purchaser in the United States." While it is stated in exhibits 1 and 2 that goods in widths of 41 inches are not sold for use in Belgium or other foreign countries, the affiant states that

I have carefully checked all of the sales or offers to Golding Bros. Co., Inc. All of this goods is either identical with (as far as texture and structure is concerned), or similar to merchandise manufactured by ourselves and other mills for other customers, and sold in the usual course of trade for exportation to the United States and in the usual wholesale quantities, as well as for consumption in Belgium.

Even if each customer in the United States selected a different pattern, if the qualities that the different buyers purchased were the same, the goods purchased by the various importers would be similar and the sales of similar goods would establish export values in the absence of sales of identical goods. Therefore it cannot be logically asserted that there are no export values because each customer purchased a different pattern.

Appellant cites *Golding Bros. Co., Inc.* v. *United States*, Reap. Dec. 4929, wherein the trial court held that the mattress tickings therein involved should be appraised on the basis of United States value. That decision was affirmed by this division in Reap. Dec. 5196. The record in that case did not show that offers of the same or similar goods were made at the invoice prices either for home consumption or for export. All the record showed was the manufacturer was "prepared and willing to sell * * * the identical qualities at the prices at which the same were sold and invoiced to Golding Bros. Co., Inc." The court held that, in the absence of a showing that offers were made, the importer failed to establish a foreign or export value. Each case must be decided on the basis of its own record and the fact that certain qualities of mattress tickings in one case are held dutiable at the United States value thereof does not establish that all qualities produced by all of the manufacturers should be appraised on that basis.

The method of appraisement designated as "United States value" in section 402 (e) of the Tariff Act of 1930 cannot be adopted if there is either a foreign or an export value for the imported goods.

We find that the following facts are established by the weight of evidence in this case:

(1) The merchandise in question consists of mattress tickings, 41 and 56 inches in width, imported from Belgium in January and May, 1938.

(2) There were foreign values for such or similar 56-inch width tickings at the time of exportation but such foreign values were not higher than the invoice values in this case.

(3) Merchandise similar to that herein involved was freely offered for sale at the time of exportation of the goods herein in the principal market of Belgium to all purchasers in the usual wholesale quantities, in the ordinary course of trade, for exportation to the United States, at prices not higher than the invoice prices of the merchandise herein involved.

(4) The principal market for mattress tickings in Belgium is in the vicinity of Courtrai and the usual wholesale quantity in which such merchandise was offered and sold is what is known as "one piece," consisting of 50 meters or more in length and either 41 or 56 inches in width.

(5) The proper basis for appraisement for said goods is export value which is defined in section 402 (e) of the Tariff Act of 1930.

(6) Such export values for the goods are the invoice values in this case.

The judgment of the trial court holding that the proper dutiable values of the mattress tickings in this case were the invoice values, which are the export values of the goods at the time of shipment, is affirmed.